UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-884-SEB-JMS |
| | ) | |
| JUDITH A. ARMSTRONG, Personal | ) | |
| Representative of the Estate of John David | ) | |
| Baker, DOROTHY JEAN BAKER, | ) | |
| WILLIAM P. STEPHENS, MARIGRACE | ) | |
| STEPHENS, AETNA, INC., and THE ST. | ) | |
| PAUL TRAVELERS COMPANY, INC., | ) | |
| Defendants. | ) | |

**ENTRY GRANTING IN PART MOTIONS FOR SUMMARY JUDGMENT**[1]

This case involves the intriguing tale of a particularly valuable postage stamp.

Some forty years ago, on the evening of December 9, 1967, the home of J. David Baker, a

prominent Indianapolis philatelist, was burglarized, and the one-of-a-kind "Ice House

Cover" – an envelope franked with a rare 90-cent 1869 pictorial issue stamp, bearing the

image of Abraham Lincoln – disappeared, along with over two hundred other valuable

philatelic articles.  Though nearly all of the stolen items were eventually recovered by law

enforcement officers during the 1970s, the Ice House Cover never turned up, and by all

accounts, it was assumed destroyed.

---

[1] This entry addresses the four outstanding motions for summary judgment among the
various parties in this case, at Docket Numbers 125, 126, 133, and 146.  In addition, Defendants
Judith Armstrong and Dorothy Jean Baker have requested oral argument on their two summary
judgment motions [Docket Nos. 125 and 133].  We DENY Defendants Armstrong and Baker's
requests.  We are able to reach our decision in this matter based upon the very thorough briefings
submitted to us by the parties, making oral argument unnecessary.

That is, until January 4, 2006, when William and Marigrace Stephens visited a Chicago stamp shop, seeking to learn the value of several philatelic items in their possession – including the Ice House Cover.  It is unclear precisely when or how the Stephenses came to possess this long-lost item.  Upon being informed that the Ice House Cover was stolen property, the Stephenses relinquished possession of it to the FBI, though whether their relinquishment was voluntary is in dispute.  The FBI has retained possession of the valuable item ever since.

Now, numerous parties are vying for ownership of this unexpectedly recovered philatelic rarity.  Mr. Baker's estate and his widow, Dorothy Jean Baker, claim entitlement to it; so does Mr. Baker's former insurance company and its successor in interest; and so do William and Marigrace Stephens.  The United States initiated this interpleader action to resolve ownership of the Ice House Cover and to protect itself from multiple suits asserting an interest in it.

### Factual Background

During his lifetime, J. David Baker was an expert philatelist, a well-known stamp collector, and a prolific author on the subject of United States classic stamps.  He served in various positions (including the presidency) of the United States Philatelic Classics Society, contributed regularly to philatelic periodicals, and authored the two-volume Postal History of Indiana.  Stip. Facts[2] ¶ 5; Dorothy Jean Baker Aff. ¶ 4.  Mr. Baker's

---

[2] Throughout this entry, our citations to "Stip. Facts" refer to the submitted Stipulated
(continued...)

great enthusiasm for philatelic endeavors led him to acquire an extensive stamp collection which he developed over several decades, until his death on April 26, 1979.  Stip. Facts ¶ 5.

The rarest and most valuable item in Mr. Baker's collection was the Ice House Cover.  Id. ¶ 10.  In philatelic parlance, a "cover" refers to a stamped, franked envelope that has been sent through the mails.  The Ice House Cover is so called because it was mailed from Boston, Massachusetts, to James H. Bancroft at the "Ice House" in Calcutta, East Indies, in 1873. The cover bears a ninety-cent 1869 pictorial issue United States postage stamp, bearing the image of Abraham Lincoln.  This stamp is popular among collectors because the 1869 issue was the first pictorial series issued by the United States Postal Service, and the limited-circulation ninety-cent denomination was the most expensive stamp in the issue.  The Ice House Cover is unique because it is the only cover in existence to bear such a stamp.  Id. ¶¶ 1, 2, 4.  Mr. Baker had acquired the Ice House Cover in 1964 for $6,500.00.  Baker/Aetna Mem.[3] at 2.

---

[2](...continued)
Facts for Purposes of Cross-Motions for Summary Judgment Between Defendants Armstrong and Baker and Defendants Travelers and Aetna [Docket No. 131].

[3] Because this entry refers to arguments raised in briefings on each of four interrelated motions for summary judgment, we find it necessary to distinguish among those sets of briefings in our citations.  Throughout this entry, our citations to briefings labeled "Baker/Aetna" refer to briefings submitted in support of, or in response to, Defendants Baker and Armstrong's Motion for Summary Judgment Against Defendants Aetna and Travelers [Docket No. 125].  Citations to briefings labeled "Aetna/Baker" refer to briefings submitted in support of, or in response to, Defendants Aetna and Traveler's Motion for Summary Judgment Against Defendants Baker and Armstrong [Docket No. 126].  Citations to briefings labeled "Aetna/Stephens" refer to briefings submitted in support of, or in response to, Defendants Aetna and Traveler's Motion for

(continued...)

*Theft of the Ice House Cover*

On December 9, 1967, members of an organized crime syndicate broke into the home of Mr. Baker and his wife, Dorothy Jean Baker, while they were out for the evening.  The thieves stole approximately 237 covers and stamps from the Baker home, including the Ice House Cover.  The theft of the Ice House Cover became well-known to members of the philatelic community.  Id. ¶¶ 6, 7.  The Indianapolis Police Department and Federal Bureau of Investigation began investigating the incident shortly thereafter.  Mr. Baker worked with the law enforcement agencies and made efforts on his own to recover his collection, including hiring a private investigator, offering a personal reward, and spreading news of the crime throughout the philatelic community.  Id. ¶ 8.

At the time, Mr. Baker was insured under a Personal Articles Policy Floater by Aetna Insurance Company ("Aetna")[4].  The policy was in full effect at the time of the

_____

[3](...continued)
Summary Judgment Against Defendants William and Marigrace Stephens [Docket No. 146].
Citations to briefings labeled "Baker/Stephens" refer to briefings submitted in support of, or in response to, Defendants Baker and Armstrong's Motion for Summary Judgment Against Defendants William and Marigrace Stephens [Docket No. 133].

[4] Aetna's corporate form has undergone numerous iterations over the years since it insured Mr. Baker.  During all relevant times, Aetna Insurance Company has been a wholly-owned subsidiary of The Aetna Life and Casualty Company.  In 1995, The Travelers Insurance Group, Inc. succeeded to all rights of The Aetna Life and Casualty Company.  The St. Paul Companies, Inc. then acquired those rights through its acquisition of the Travelers Property Casualty Company in 2003, through which its name was changed to The St. Paul Travelers Companies, Inc.  In February 2007, this name was changed again to The Travelers Companies, Inc.  Stip. Facts ¶¶ 25, 26.
Throughout this entry, we shall refer to The Travelers Companies, Inc. (which is here inaccurately identified as The St. Paul Travelers Company, Inc.) as "Travelers," and to The Aetna Casualty and Surety Company (which is here inaccurately identified as Aetna, Inc.) as
(continued...)

4

burglary on December 9, 1967.  Joint Ex. 2; Stip. Facts ¶ 9.  On December 12, 1967, Mr.

Baker prepared an inventory of the articles which were stolen from him, including the Ice

House Cover.  Joint Ex. 3.

On March 15, 1968, Mr. Baker executed and provided to Aetna a "Sworn

Statement in Proof of Loss" relating to the burglary.  That document sets forth that the

actual cash value of the stolen property at the time of the loss was $147,492.44, and that

the actual loss and damage to the property as a result of the loss was $86,892,44.  Joint

Ex. 4.  Pursuant to Mr. Baker's policy, Aetna paid Mr. Baker the sum of $86,892.44 for

the loss of his stolen property.  Stip. Facts ¶¶ 11, 12.  According to the terms of the

agreement, Mr. Baker accepted this payment from Aetna "in full release and satisfaction

in compromise settlement of all claims under this policy. . . . In consideration of the

payment to be made hereunder, the insured does hereby subrogate to said Insurer all right,

title and interest in and to the property for which claim is being made hereunder[.]"  Joint

Ex. 4.

### *Recovery of Stolen Items and Baker v. Aetna*

During the mid-1970s, law enforcement authorities in Boston and Chicago

recovered most of the stolen items from Mr. Baker's collection – in fact, all but two of the

---

[4](...continued)
"Aetna."  Where the distinction between the two related companies is immaterial, we refer to
them collectively as "Aetna."

The parties do not dispute that all rights of Aetna Insurance Company and The Aetna
Casualty and Surety Company currently reside in The Travelers Companies, Inc.  Aetna/Baker
Mem. at 9.

stolen items were recovered.  The Ice House Cover was one of these two unrecovered items.  Id. ¶ 13.  Those items that were recovered were surrendered to Aetna.  Joint Ex. 5 (Baker v. Aetna Judgment) Findings of Fact ¶ 8.

In November 1975, Mr. Baker filed a complaint against Aetna in Hamilton Superior Court, Cause No. S76-082, J. David Baker v. Aetna Insurance Company and Charles Jennings (hereinafter "Baker v. Aetna"), which was heard by Judge V. Sue Shields.[5]  Mr. Baker sought to reclaim possession of the recovered philatelic items from Aetna.

On November 16, 1977, Judge Shields handed down her judgment in Baker v. Aetna, in which she emphasized that the value of the philatelic items at issue had "substantially, yet fortuitously, appreciated" since the loss payment, and that "the philatelic items in question are relatively unique and irreplaceable."  Joint Ex. 5 Findings of Fact ¶¶ 15, 20.  She further noted that "[n]either the insured nor the insuror at the time of loss payment and settlement fully contemplated the possibility of the present situation: salvage of a substantial portion of the collection which have dramatically increased in value over the years."  Id. Findings of Fact ¶ 21 (emphasis in original).

Therefore, though "the undisputed facts [did] not support an action based on contract, or one at law," and Aetna had "acquired all right, title, and interest in the

_____

[5] We note in passing that Judge Shields recently retired after completing her term of exceptional service as a United States Magistrate Judge with this court, a position she held with great distinction following her equally distinguished career as a trial and appellate judge for the State of Indiana.  We continue to miss her wisdom and collegiality here.

property in question, including all salvage rights" upon execution of the Statement in
Proof of Loss, Judge Shields held that "[n]evertheless, in view of the rather unique
character of the philatelic items recovered and their substantial yet fortuitous increase in
value since 1967, in the sound exercise of its discretion, this Court grants . . . equitable
relief [to Mr. Baker]" by entering judgment granting possession of the recovered
philatelic items to Mr. Baker upon reimbursement to Aetna. Id. Conclusions of Law ¶¶ 3,
5, 8. Specifically, Mr. Baker was to pay Aetna $86,892.44 – the amount of the loss
payment previously made to him by Aetna – plus interest. In return, Aetna was to
"relinquish and divest itself of all right, title, and interest to the philatelic items recovered
that are in its possession and shall transfer possession of all of the philatelic items in its
possession to J. David Baker or [his representative]." Id. Conclusions of Law ¶¶ 8A-8C.

On December 21, 1977, Mr. Baker and Aetna entered into a settlement agreement
whereby Mr. Baker tendered to Aetna a payment of $143,650.00.[6] In return, Aetna
delivered to Mr. Baker "all philatelic items (stamps, covers, and stampless covers) in
Aetna's custody or control which formed the basis of [the Baker v. Aetna lawsuit]." Joint
Ex. 6 (Notice to the Court Regarding Settlement and Receipt) at 2. The agreement
between the parties, entitled "Receipt," further stated that: "By execution of this

---

[6] The Stipulated Facts cites the amount of Mr. Baker's payment as $142,650, though the
receipt itself states that the amount was $143,650. Stip. Facts ¶ 17; Joint Ex. 6 at 2. We assume
this discrepancy is due to a clerical error. Defendants Baker and Armstrong describe this
amount paid as constituting the $86,892.44 reimbursement (as ordered by Judge Shields), plus
$55,757.56 in interest. Baker/Aetna Mem. at 3. Though this amount is exactly $1,000 less than
the payment cited in the receipt, we assume this is due to computational error based on the
apparent clerical error in the Stipulated Facts.

agreement, J. David Baker acknowledges receipt of all such philatelic items and hereby releases Aetna Insurance Company . . . of any and every claim, demand, or right, of whatever kind or nature, on account of or in any way growing out of Mr. Baker's loss on December 10, 1967, of a collection of philatelic items covered by Aetna Policy No. PAF 033342."  Joint Ex. 6 at 2.

In April 1978, Mr. Baker sold most of his recovered philatelic items at auction. The total "hammer" price for the lots in the auction was $760,940.00, and Mr. Baker received this amount less a seller's commission of not more than twenty percent; Aetna received no compensation from the sale.  Stip. Facts ¶¶ 18-20.  Mr. Baker died on April 26, 1979.  Id. ¶ 24.

### The Ice House Cover, Recovered

The Ice House Cover's whereabouts remained unknown after it was stolen from the Baker home on December 9, 1967 – until January 4, 2006, when William and Marigrace Stephens took the Ice House Cover to the Stamp King in Chicago to determine its value.  During the visit, the Ice House Cover was identified as stolen, and the Chicago Police Department and FBI were notified.  Id. ¶¶ 21, 22.

There is significant dispute as to how the Stephenses came to possess the Ice House Cover.  The Stephenses attest that they purchased the Ice House Cover at a flea market in the mid-1980s.  W. Stephens Dep. at 44; William and Marigrace Stephens's Answers to Interrogs. (Ex. D) ¶ 21.  They assert that they kept it in their home from the

time of purchase until it was taken into custody by the FBI.  W. Stephens Dep. at 37.

Other evidence suggests that the Stephenses informed Charles Berg, the owner of the Stamp King, that they found the Ice House cover while cleaning out the home of a deceased relative or friend a few years earlier; the Stephenses dispute that they ever said this to Mr. Berg.  Berg Aff. ¶ 4; W. Stephens Dep. at 24; M. Stephens Dep. at 12-13.  Sergeant George Koste of the Chicago Police Department, who responded to the call from the Stamp King, also testified that the Stephenses told him they found the Ice House Cover in the house of a deceased relative.  FBI Special Agent Craig Henderson testified that William Stephens told him that he did not know how he and his wife had come into possession of the Ice House Cover, but "he either recovered it from a deceased relative/family friend, or more likely found it at a garage sale."  Koste Dep. at 4, Henderson Dep. at 13-14.  The Stephenses dispute making these statements as well.  The following day, William Stephens allegedly told FBI Special Agent Michael Christian that he "could not remember when or where the cover was purchased."  Ex. B (FBI report) at 1.  In the estimation of the other defendants, based on the disparate versions of events given at various times, the Stephenses "do not know, with any reliability, when or how they came into possession of the Ice House Cover."  Stip. Facts ¶ 23.

There is also disagreement among the parties as to whether the Stephenses voluntarily parted with the Ice House Cover at the Stamp King.  Some of the evidence suggests that, upon being notified that the Ice House Cover was stolen property, the FBI took possession of it at the request of the Stephenses.  Stip. Facts ¶ 22.  Mr. Berg testified

9

that he called the Chicago Police Department without the Stephenses' knowledge.  Berg

Aff. ¶ 3.  According to Mr. Stephens's deposition, the Chicago Police Department told

Mr. Berg to return the Ice House Cover to Mr. Stephens.  Mr. Berg then told the police

that, if they were not going to let him (Mr. Berg) remain in possession of the cover, he

wanted them to hold it.  Mr. Stephens testified that he thought the Chicago police were

likely to lose the cover, so he said, "[w]ell, I think we should really call the FBI if it's that

valuable and give it to the FBI."  The FBI then came and took possession of the Ice

House Cover.  W. Stephens Dep. at p. 26 ln. 17 – p. 27 ln. 10.  Mr. Stephens signed a

receipt acknowledging that the FBI was receiving possession of the Ice House Cover.  Ex.

1.  Marigrace Stephens testified that she and her husband relinquished the cover to the

FBI only because they were at a "stand-off" with Mr. Berg regarding who would take

possession of it.  M. Stephens Dep. at 17.

### Present Litigation

The FBI has been in continuous possession of the Ice House Cover since its

recovery in January, 2006.  After receiving competing demands for possession of the Ice

House Cover from J. David Baker's estate,[7] Travelers, and Aetna, the United States of

America initiated the present interpleader action on June 5, 2006, to determine its

ownership.  The defendants named in this action were Ms. Armstrong, the Stephenses,

---

[7] After the FBI took possession of the Ice House Cover, Judith Armstrong, the daughter
of J. David Baker and Dorothy Jean Baker, and the personal representative of J. David Baker's
estate, reopened that estate.  Id. ¶ 27.

Aetna, Travelers (inaccurately identified as St. Paul), Jeffrey Forster, and Patricia Smithline.[8]  Compl. ¶¶ 4-10.  On December 26, 2006, we granted the motion filed by Dorothy Jean Baker, widow of J. David Baker, to intervene as a party defendant [Docket No. 77].

Currently before the court are four interrelated motions for summary judgment filed by the various defendants against one another.  Defendants Armstrong and Baker ("the Baker Defendants") and Defendants Aetna and Travelers (collectively, "Aetna") have filed cross-motions for summary judgment against each other [Docket Nos. 125 and 126].  The Baker Defendants have also moved for summary judgment against the Stephenses [Docket No. 133], as has Aetna [Docket No. 146].

## Legal Analysis

### I.   Interpleader Jurisdiction

The purpose of an interpleader action is to protect a stakeholder from the vexation of multiple lawsuits over contested property or funds, and the possibility of multiple liability that might result from adverse determinations in different courts.  See Knox v. Am. Gen. Life and Accident Ins. Co., 2003 WL 22056301, at *2 (S.D. Ind. 2003)

---

[8] Mr. Forster and Ms. Smithline are no longer part of this action.  Initially, Mr. Forster asserted that he and Duane Garrett (for whose estate Ms. Smithline is the executor) had an option contract to purchase the Ice House Cover from Aetna if it were ever recovered.  Case Management Plan [Docket No. 56] at 5-6.  Mr. Forster subsequently renounced and released all interests in the Ice House Cover; we ordered him dismissed from the lawsuit on April 30, 2007 [Docket No. 105].  Default was entered against Ms. Smithline on December 28, 2006, for failure to plead or otherwise defend as required by law [Docket No. 81].

(Barker, J.); 7 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE,

FEDERAL PRACTICE AND PROCEDURE § 1702 (3d ed. 2001).  In its Complaint for

Interpleader, the United States asserts that we have jurisdiction over this action pursuant

to the federal interpleader statute, 28 U.S.C. § 1335.  Compl. ¶ 1.  That statute provides in

relevant part that:

> The district courts shall have original jurisdiction of any civil action of interpleader or in the nature of interpleader filed by any person, firm, or corporation, association, or society having in his or its custody or possession money or property of the value of $500 or more . . . or providing for the delivery or payment or the loan of money or property of such amount or value . . . if
>
> (1) Two or more adverse claimants, of diverse citizenship as defined in subsection (a) or (d) of section 1332 of this title, are claiming or may claim to be entitled to such money or property . . . ; and if
>
> (2) the plaintiff has deposited such money or property or has paid the amount of or the loan or other value of such instrument or the amount due under such obligation into the registry of the court, there to abide the judgment of the court[.]

We note that, beyond its assertion that this statute governs the interpleader action

here, the United States has not stated with sufficient specificity how pursuant to this

statute we have jurisdiction: though it appears that at least two claimants are diverse,[9] the

---

[9] The interpleader statute contains an independent grant of federal subject matter jurisdiction; therefore, our jurisdiction under this statute does not rest on either of the traditional bases for federal jurisdiction, e.g., the presence of a federal question or complete diversity of citizenship.  4 MOORE'S FEDERAL PRACTICE § 22.04[2][b] (Matthew Bender 3d ed.).  Rather, a "minimal" diversity of citizenship – more liberal than that found in the general diversity of citizenship grant – is required, i.e. diversity of citizenship between at least two claimants.  State

(continued...)

United States has not asserted (and we have no other evidence to suggest) that it has deposited the Ice House Cover into the registry of the court.

More important, however, is the fact that our jurisdiction over an interpleader action brought by the United States arises not under the interpleader statute (28 U.S.C. § 1335) cited in the Complaint, but rather under our general jurisdiction to hear actions commenced by the United States, pursuant to 28 U.S.C. § 1345.[10]  Therefore, we conclude that the requirements of § 1335, including the deposit requirement, are not applicable to the present suit.  See 21 Federal Procedure, Lawyers Edition § 49:10 (2007); United States v. Coumantaros, 146 F.Supp. 51, 52-53 (S.D.N.Y. 1956) ("Although the complaint states that it is filed under 28 U.S.C. § 1335, this statute is not the basis of the court's jurisdiction of this suit.  The United States is not a 'person, firm, or corporation, association, or society' within the meaning of § 1335.  Jurisdiction over the subject matter . . . exists in this court by virtue of 28 U.S.C. § 1345.").

A non-statutory interpleader action such as this one is governed by Federal Rule of Civil Procedure 22.  In such "rule interpleader" actions, a court may order the stakeholder to deposit the property in controversy with the court, but such deposit is not a jurisdictional requirement, as it is for statutory interpleader.  See Gen. Ry. Signal Co. v.

_____

[9](...continued)
Farm Fire & Cas. Co. v. Tashire, 386 U.S. 523, 530 (1967).  It appears from the Complaint that this minimal diversity requirement has been met; for example, the Stephenses are Illinois residents, while Aetna is based in Connecticut.

[10] Section 1345 provides in relevant part that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States[.]"

Corcoran, 921 F.2d 700, 705 n. 4 (7th Cir. 1991).  We do not require the United States to

do so here; the FBI has been in possession of the Ice House Cover since its rediscovery,

and we have no reason to believe that it is not secure under their guardianship.  See

United States v. Herce, 334 F.Supp. 111 (S.D.N.Y. 1971) (holding that the United States

need not deposit with the court, nor post any bond in lieu of, an El Greco painting, the

ownership of which was the subject of interpleader action).

## II.      Two-Stage Interpleader Procedure

An interpleader action typically proceeds in two distinct stages.  In the first stage,

the court determines whether the various interpleader requirements have been met and

whether interpleader is an appropriate remedy given the facts of the case – i.e., that

jurisdictional requirements have been met, that the stakeholder has a legitimate fear of

multiple litigation directed at a single stake, and that the claims are adverse to the stake

and to one another.  See, e.g., Indianapolis Colts v. Baltimore, 741 F.2d 954, 958 (7th Cir.

1984).  In the second stage, the court adjudicates the adverse claims of the various

defendant claimants regarding entitlement to the *res* at issue.  See General Ry. Signal Co.

v. Corcoran, 735 F. Supp. 265, 267 (N.D. Ill. 1990), rev'd on other grounds, 921 F.2d 700

(7th Cir. 1991); see also 4 MOORE'S FEDERAL PRACTICE § 22.03 (Matthew Bender 3d

ed.).  The two stages are typically bifurcated and conducted as separate phases of the

proceedings; however, such bifurcation is not mandatory, and "the entire action may be

disposed of at one time."  New York Life Ins. Co. v. Connecticut Dev. Auth., 700 F.2d

91, 95 (2nd Cir. 1983).

As currently developed, it is clear that the prerequisites to interpleader have been satisfied.  As discussed above, we have jurisdiction over this suit; moreover, it is clear that the claims are adverse and that the United States has a legitimate fear of vexatious litigation and/or multiple liability.  Aetna asserts an entitlement to the Ice House Cover by virtue of its salvage rights as preserved in their settlement with Mr. Baker; the Baker defendants assert that the settlement payment discharged Aetna's subrogated rights to all philatelic items, including the Ice House Cover; and the Stephenses assert a claim to the stake based on their recent possession of it and several affirmative defenses (primarily a statute of limitations defense).  Because each claimant asserts sole rights to the stake, they are clearly adverse to one another.  See, e.g., Sun Life Assurance Co. v. Thomas, 735 F. Supp. 730, 731-32 (W.D. Mich. 1990).

However, the parties have inconsistent views regarding the ripeness of any resolution adjudicating the merits of their claims.  The special procedural requirements of an interpleader action have gone largely unacknowledged by Aetna and the Baker Defendants; both of their sets of briefs present the matter to be adjudicated in a fairly typical summary judgment framework, entirely devoted to those claimants' substantive arguments on the merits regarding ownership of the Ice House Cover.  The Stephenses, on the other hand, assert that both Aetna and the Baker Defendants "improperly seek a declaration of ownership, an issue which cannot be resolved in their motions." Aetna/Stephens Resp. at 3.  The Stephenses maintain that a determination of adversary

15

claims among the various defendants is not currently before us, and involves genuine disputes of material fact "to be determined at trial."  Baker/Stephens Resp. at 7.  They state that it is not until the second stage of an interpleader action that defendants interplead claims among one another; though they hint that they *have* a claim on the merits (which appears to be related to the statute of limitations), they have not developed the substance of that claim to any discernible extent.

Neither approach taken by the parties up to this point can be characterized as wholly prudent.  While an interpleader action *may* be both deemed appropriate and resolved on its merits at one time, this is not the typical method of proceeding; Aetna and the Baker Defendants brush off the Stephenses' protestations to this effect.  At the same time, the Stephenses' approach carries significant risk by leaning so heavily on a procedural assumption, not shared by the other defendants, and leaving their substantive ownership claim undeveloped.  In any event, in the interests of fairness and in order to render a final ruling on the merits, we shall allow the parties (particularly, the Stephenses) additional time in which to develop their substantive claim to ownership.  In consideration of the upcoming holiday season, we grant the Stephenses forty-five days from the date of this entry within which to file a supplemental brief developing the merits of their case.  All other claimants shall thereafter have fifteen days in which to file responses to the Stephenses' arguments.  The Stephenses may file their rebuttal, if any, within five days after the opposing briefs were filed.

16

**III.    Conclusion**

Accordingly, each of the four pending motions for summary judgment is

<u>GRANTED IN PART</u> to the extent that we hold that all interpleader requirements have

been met.  Further ruling is <u>RESERVED</u> as to all remaining issues in order to permit

further development and submission of the merits of the interpleader defendants' claims.

IT IS SO ORDERED.



Date: ___12/17/2007___

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Dean R. Brackenridge
LOCKE REYNOLDS LLP
dbrackenridge@locke.com

David W. Craig
CRAIG KELLEY & FAULTLESS
dcraig@ckflaw.com

Kerri Elizabeth Farmer
CRAIG KELLEY & FAULTLESS
kfarmer@ckflaw.com

Scott Anthony Faultless
CRAIG KELLEY & FAULTLESS
sfaultless@ckflaw.com

Jamie Ranah Kendall
PRICE WAICUKAUSKI & RILEY
jkendall@price-law.com

Erin Reilly Lewis
UNITED STATES ATTORNEY'S OFFICE
shaq.shockley@usdoj.gov

Henry J. Price
PRICE WAICUKAUSKI & RILEY
hprice@price-law.com

William N. Riley
PRICE WAICUKAUSKI & RILEY
wriley@price-law.com

Steven J. Strawbridge
LOCKE REYNOLDS LLP
sstrawbridge@locke.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov