UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-884-SEB-JMS |
| | ) | |
| JUDITH A. ARMSTRONG, PERSONAL | ) | |
| REPRESENTATIVE OF THE ESTATE OF | ) | |
| JOHN DAVID BAKER, DOROTHY JEAN | ) | |
| BAKER, WILLIAM P. STEPHENS, | ) | |
| MARIGRACE STEPHENS, AETNA, INC., | ) | |
| and THE ST. PAUL TRAVELERS | ) | |
| COMPANY, INC., | ) | |
| Defendant. | ) | |

**ENTRY ON PENDING MOTIONS**

As explained in our prior entry addressing the issues in this case,[1] the dispute

among the parties involves the one-of-a-kind "Ice House Cover," an envelope franked

with a rare 90-cent 1869 pictorial issue stamp, bearing the image of Abraham Lincoln.

On December 9, 1967, the Ice House Cover, along with over two hundred other valuable

philatelic articles, was stolen from the home of J. David Baker, a prominent Indianapolis

philatelist.  Although nearly all of the stolen collection was eventually recovered by law

enforcement officers during the 1970s, the Ice House Cover was not recovered.  The Ice

House Cover did not reappear until January 4, 2006, when William and Marigrace

---

[1] Our prior order [Docket No. 166] was entered on December 17, 2007 (hereinafter "the
December 17th entry").

Stephens brought several items, including the Ice House Cover, to be appraised at a stamp shop in Chicago, Illinois.  It is unclear when or how the Stephenses came into possession of the Ice House Cover, but, upon notification that it was stolen property, the Stephenses relinquished the stamp to the FBI,[2] who has retained possession of it since then.

Mr. Baker's estate[3] and his widow, Dorothy Jean Baker, Mr. Baker's former insurance company and its successor in interest, and William and Marigrace Stephens are currently all vying for ownership of this unexpectedly recovered philatelic rarity.  The United States initiated this interpleader action to resolve ownership of the Ice House Cover and to protect itself from multiple suits asserting an interest in it.  This matter was originally before us on four interrelated motions for summary judgment filed by the various defendants against one another.  Defendants Judith A. Armstrong and Dorothy Jean Baker ("the Baker Defendants") and Defendants The Aetna Casualty and Surety Company (inaccurately identified as Aetna, Inc.), and The Travelers Companies, Inc., f/k/a The St. Paul Travelers Companies, Inc. (inaccurately identified as The St. Paul Travelers, Inc.) (collectively, "Aetna"), have filed cross-motions for summary judgment against each other [Docket Nos. 125 and 126].  The Baker Defendants have also moved for summary judgment against the Stephenses [Docket No. 133], as has Aetna [Docket

---

[2] The parties dispute whether the relinquishment was voluntary or not.  We discuss this disagreement in detail below.

[3] After the FBI took possession of the Ice House Cover, Judith Armstrong, the daughter of J. David Baker and Dorothy Jean Baker, and the personal representative of J. David Baker's estate, reopened that estate.

No. 146].

In our December 17th entry, in which we initially addressed the four summary judgment motions, we granted each motion in part, insofar that we held that all the interpleader requirements have been met in this case.  However, we reserved judgment as to all remaining issues in order to permit further development of the issues and submission of supplemental materials.  Entry of December 17, 2007, at 17.  Having given the parties the opportunity to make additional submissions, we now return to the merits of the interpleader defendants' claims.  Additionally, in the interim, the Stephenses have filed a motion to strike [Docket No. 178] some of the Baker Defendants' and Aetna's additional submissions and have also made a demand for a jury trial [Docket No. 188].

For the reasons detailed below, we <u>GRANT</u> the Baker Defendants' Motion for Summary Judgment against Aetna, <u>DENY</u> Aetna's Motion for Summary Judgment against the Baker Defendants, <u>DENY</u> the Baker Defendants' Motion for Summary Judgment against the Stephenses, and <u>DENY AS MOOT</u> Aetna's Motion for Summary Judgment against the Stephenses.  Additionally, we <u>DENY</u> the Stephenses' Motion to Strike and <u>DENY</u> the Stephenses' Motion for a Jury Trial.

**<u>Factual Background</u>**[4]

---

[4] We have discussed the facts underlying this dispute in our December 17th entry and reiterate them here to the extent that they are relevant to an understanding of the issues now before us.

3

During his lifetime, J. David Baker was an expert philatelist, a well-known stamp collector, and a prolific author on the subject of United States classic stamps. He served in various positions (including the presidency) of the United States Philatelic Classics Society, contributed regularly to philatelic periodicals, and authored the two-volume Postal History of Indiana. Stip. Facts[5] ¶ 5; Dorothy Jean Baker Aff. ¶ 4. Mr. Baker's great enthusiasm for philatelic endeavors led him to acquire an extensive stamp collection which he developed over several decades, until his death on April 26, 1979. Stip. Facts ¶ 5.

The rarest and most valuable item in Mr. Baker's collection was the Ice House Cover. Id. ¶ 10. In philatelic parlance, a "cover" refers to a stamped, franked envelope that has been sent through the mails. The Ice House Cover is so called because it was mailed from Boston, Massachusetts, to James H. Bancroft at the "Ice House" in Calcutta, East Indies, in 1873. The cover bears a ninety-cent 1869 pictorial issue United States postage stamp, bearing the image of Abraham Lincoln. This stamp is popular among collectors because the 1869 issue was the first pictorial series issued by the United States Postal Service, and the limited-circulation ninety-cent denomination was the most expensive stamp in the issue. The Ice House Cover is unique because it is the only cover in existence to bear such a stamp. Id. ¶¶ 1, 2, 4. Mr. Baker had acquired the Ice House

---

[5] Throughout this entry, our citations to "Stip. Facts" refer to the submitted Stipulated Facts for Purposes of Cross-Motions for Summary Judgment Between Defendants Armstrong and Baker and Defendants Travelers and Aetna [Docket No. 131]. Any disagreements that the Stephenses have with the stipulated facts are specifically noted.

Cover in 1964 for $6,500.00.  Baker/Aetna Mem.[6] at 2.

### *Theft of the Ice House Cover*

On December 9, 1967, members of an organized crime syndicate broke into the home of Mr. Baker and his wife, Dorothy Jean Baker, while they were out for the evening.  The thieves stole approximately 237 covers and stamps from the Baker home, including the Ice House Cover.  The theft of the Ice House Cover became well-known among members of the philatelic community.  Id. ¶¶ 6, 7.  The Indianapolis Police Department and Federal Bureau of Investigation began investigating the incident shortly thereafter.  Mr. Baker worked with the law enforcement agencies and made efforts on his own to recover his collection, including hiring a private investigator, offering a personal reward, and spreading news of the crime throughout the philatelic community.  Id. ¶ 8.

At the time, Mr. Baker was insured under a Personal Articles Policy Floater by

---

[6] Because this entry refers to arguments raised in briefings on each of four interrelated motions for summary judgment, we find it necessary to distinguish among those sets of briefings in our citations.  Throughout this entry, our citations to briefings labeled "Baker/Aetna" refer to briefings submitted in support of, or in response to, Defendants Baker and Armstrong's Motion for Summary Judgment Against Defendants Aetna and Travelers [Docket No. 125].  Citations to briefings labeled "Aetna/Baker" refer to briefings submitted in support of, or in response to, Defendants Aetna and Traveler's Motion for Summary Judgment Against Defendants Baker and Armstrong [Docket No. 126].  Citations to briefings labeled "Aetna/Stephens" refer to briefings submitted in support of, or in response to, Defendants Aetna and Traveler's Motion for Summary Judgment Against Defendants William and Marigrace Stephens [Docket No. 146].  Citations to briefings labeled "Baker/Stephens" refer to briefings submitted in support of, or in response to, Defendants Baker and Armstrong's Motion for Summary Judgment Against Defendants William and Marigrace Stephens [Docket No. 133].

Aetna Insurance Company ("Aetna")[7].  The policy was in full effect at the time of the

burglary on December 9, 1967.  Joint Ex. 2; Stip. Facts ¶ 9.  On December 12, 1967, Mr.

Baker prepared an inventory of the articles which were stolen from him, including the Ice

House Cover.  Joint Ex. 3.

On March 15, 1968, Mr. Baker executed and provided to Aetna a "Sworn

Statement in Proof of Loss" relating to the burglary.  That document sets forth that the

actual cash value of the stolen property at the time of the loss was $147,492.44, and that

the actual loss and damage to the property as a result of the loss was $86,892,44.  Joint

Ex. 4.  Pursuant to Mr. Baker's policy, Aetna paid Mr. Baker the sum of $86,892.44 for

the loss of his stolen property.  Stip. Facts ¶¶ 11, 12.  According to the terms of the

agreement, Mr. Baker accepted this payment from Aetna "in full release and satisfaction

in compromise settlement of all claims under this policy. . . . In consideration of the

---

[7] Aetna's corporate form has undergone numerous iterations over the years since it insured Mr. Baker.  During all relevant times, Aetna Insurance Company has been a wholly-owned subsidiary of The Aetna Life and Casualty Company.  In 1995, The Travelers Insurance Group, Inc. succeeded to all rights of The Aetna Life and Casualty Company.  The St. Paul Companies, Inc. then acquired those rights through its acquisition of the Travelers Property Casualty Company in 2003, through which its name was changed to The St. Paul Travelers Companies, Inc.  In February 2007, this name was changed again to The Travelers Companies, Inc.  Stip. Facts ¶¶ 25, 26.

Throughout this entry, we shall refer to The Travelers Companies, Inc. (which is here inaccurately identified as The St. Paul Travelers Company, Inc.) as "Travelers," and to The Aetna Casualty and Surety Company (which is here inaccurately identified as Aetna, Inc.) as "Aetna."  Where the distinction between the two related companies is immaterial, we refer to them collectively as "Aetna."

The parties do not dispute that all rights of Aetna Insurance Company and The Aetna Casualty and Surety Company currently reside in The Travelers Companies, Inc.  Aetna/Baker Mem. at 9.

payment to be made hereunder, the insured does hereby subrogate to said Insurer all right, title and interest in and to the property for which claim is being made hereunder[.]"  Joint Ex. 4.

### *Recovery of Stolen Items and <u>Baker v. Aetna</u>*

During the mid-1970s, law enforcement authorities in Boston and Chicago recovered most of the stolen items from Mr. Baker's collection – in fact, all but two of the stolen items were recovered.  The Ice House Cover was one of these two unrecovered items.  <u>Id.</u> ¶ 13.  Those items that were recovered were surrendered to Aetna.  Joint Ex. 5 (<u>Baker v. Aetna</u> Judgment) Findings of Fact ¶ 8.

In November 1975, Mr. Baker filed a complaint against Aetna in Hamilton Superior Court, Cause No. S76-082, <u>J. David Baker v. Aetna Insurance Company and Charles Jennings</u> (hereinafter "<u>Baker v. Aetna</u>"), which was heard by Judge V. Sue Shields.  Mr. Baker sought to reclaim possession of the recovered philatelic items from Aetna.

On November 16, 1977, Judge Shields handed down her judgment in <u>Baker v. Aetna</u>, in which she emphasized that the value of the philatelic items at issue had "substantially, yet fortuitously, appreciated" since the loss payment, and that "the philatelic items in question are relatively unique and irreplaceable."  Joint Ex. 5 Findings of Fact ¶¶ 15, 20.  She further noted that "[n]either the insured nor the insuror at the time of loss payment and settlement fully contemplated the possibility of the present situation:

salvage of a substantial portion of the collection which have <u>dramatically</u> increased in value over the years." <u>Id.</u> Findings of Fact ¶ 21 (emphasis in original).

Therefore, though "the undisputed facts [did] not support an action based on contract, or one at law," and Aetna had "acquired all right, title, and interest in the property in question, including all salvage rights" upon execution of the Statement in Proof of Loss, Judge Shields held that "[n]evertheless, in view of the rather unique character of the philatelic items recovered and their substantial yet fortuitous increase in value since 1967, in the sound exercise of its discretion, this Court grants . . . equitable relief [to Mr. Baker]" by entering judgment granting possession of the recovered philatelic items to Mr. Baker upon reimbursement to Aetna. <u>Id.</u> Conclusions of Law ¶¶ 3, 5, 8. Specifically, Mr. Baker was to pay Aetna $86,892.44 – the amount of the loss payment previously made to him by Aetna – plus interest. In return, Aetna was to "relinquish and divest itself of all right, title, and interest to the philatelic items recovered that are in its possession and shall transfer possession of all of the philatelic items in its possession to J. David Baker or [his representative]." <u>Id.</u> Conclusions of Law ¶¶ 8A-8C.

On December 21, 1977, Mr. Baker and Aetna entered into a settlement agreement whereby Mr. Baker tendered to Aetna a payment of $143,650.00.[8] In return, Aetna

---

[8] The Stipulated Facts cites the amount of Mr. Baker's payment as $142,650, though the receipt itself states that the amount was $143,650. Stip. Facts ¶ 17; Joint Ex. 6 at 2. We assume this discrepancy is due to a clerical error. Defendants Baker and Armstrong describe this amount paid as constituting the $86,892.44 reimbursement (as ordered by Judge Shields), plus $55,757.56 in interest. Baker/Aetna Mem. at 3. Though this amount is exactly $1,000 less than the payment cited in the receipt, we assume this is due to computational error based on the

(continued...)

delivered to Mr. Baker "all philatelic items (stamps, covers, and stampless covers) in Aetna's custody or control which formed the basis of [the Baker v. Aetna lawsuit]."  Joint Ex. 6 (Notice to the Court Regarding Settlement and Receipt) at 2.  The agreement between the parties, entitled "Receipt," further stated that: "By execution of this agreement, J. David Baker acknowledges receipt of all such philatelic items and hereby releases Aetna Insurance Company . . . of any and every claim, demand, or right, of whatever kind or nature, on account of or in any way growing out of Mr. Baker's loss on December 10, 1967, of a collection of philatelic items covered by Aetna Policy No. PAF 033342."  Joint Ex. 6 at 2.

In April 1978, Mr. Baker sold most of his recovered philatelic items at auction. The total "hammer" price for the lots in the auction was $760,940.00, and Mr. Baker received this amount less a seller's commission of not more than twenty percent; Aetna received no compensation from the sale.  Stip. Facts ¶¶ 18-20.  Mr. Baker died on April 26, 1979.  Id. ¶ 24.

### The Ice House Cover, Recovered

The Ice House Cover's whereabouts remained unknown after it was stolen from the Baker home on December 9, 1967 – until January 4, 2006, when William and Marigrace Stephens took the Ice House Cover to the Stamp King in Chicago to determine

_____

[8](...continued)
apparent clerical error in the Stipulated Facts.

its value.  During the visit, the Ice House Cover was identified as stolen, and the Chicago

Police Department and FBI were notified.  Id. ¶¶ 21, 22.

There is significant dispute as to how the Stephenses came to possess the Ice

House Cover.  The Stephenses attest that they purchased the Ice House Cover at a flea

market in the mid-1980s.  W. Stephens Dep. at 44; William and Marigrace Stephens's

Answers to Interrogs. (Ex. D) ¶ 21.  They assert that they kept it in their home from the

time of purchase until it was taken into custody by the FBI.  W. Stephens Dep. at 37.

Other evidence suggests that the Stephenses informed Charles Berg, the owner of

the Stamp King, that they found the Ice House cover while cleaning out the home of a

deceased relative or friend a few years earlier; the Stephenses dispute that they ever said

this to Mr. Berg.  Berg Aff. ¶ 4; W. Stephens Dep. at 24; M. Stephens Dep. at 12-13.

Sergeant George Koste of the Chicago Police Department, who responded to the call from

the Stamp King, also testified that the Stephenses told him they found the Ice House

Cover in the house of a deceased relative.  FBI Special Agent Craig Henderson testified

that William Stephens told him that he did not know how he and his wife had come into

possession of the Ice House Cover, but "he either recovered it from a deceased

relative/family friend, or more likely found it at a garage sale."  Koste Dep. at 4,

Henderson Dep. at 13-14.  The Stephenses dispute making these statements as well.  The

following day, William Stephens allegedly told FBI Special Agent Michael Christian that

he "could not remember when or where the cover was purchased."  Ex. B (FBI report) at

1.  In the estimation of the other defendants, based on the disparate versions of events

given at various times, the Stephenses "do not know, with any reliability, when or how they came into possession of the Ice House Cover." Stip. Facts ¶ 23.

There is also disagreement among the parties as to whether the Stephenses voluntarily parted with the Ice House Cover at the Stamp King. Some of the evidence suggests that, upon being notified that the Ice House Cover was stolen property, the FBI took possession of it at the request of the Stephenses. Stip. Facts ¶ 22. Mr. Berg testified that he called the Chicago Police Department without the Stephenses' knowledge. Berg Aff. ¶ 3. According to Mr. Stephens's deposition, the Chicago Police Department told Mr. Berg to return the Ice House Cover to Mr. Stephens. Mr. Berg then told the police that, if they were not going to let him (Mr. Berg) remain in possession of the cover, he wanted them to hold it. Mr. Stephens testified that he thought the Chicago police were likely to lose the cover, so he said, "[w]ell, I think we should really call the FBI if it's that valuable and give it to the FBI." The FBI then came and took possession of the Ice House Cover. W. Stephens Dep. at p. 26 ln. 17 – p. 27 ln. 10. Mr. Stephens signed a receipt acknowledging that the FBI was receiving possession of the Ice House Cover. Ex. 1. Marigrace Stephens testified that she and her husband relinquished the cover to the FBI only because they were at a "stand-off" with Mr. Berg regarding who would take possession of it. M. Stephens Dep. at 17.

## **Legal Analysis**

## I.      Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Illinois, Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle

for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enter., Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

Courts are often confronted with cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief.  "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard."  Kohl v. Ass'n. of Trial Lawyers of Am., 183 F.R.D. 475 (D.Md.1998). Thus, in determining whether genuine and material factual disputes exist in this case, the Court has considered the parties' respective memoranda and the exhibits attached thereto, and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective non-movant.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

## II.   Summary Judgment Motions

We shall start our analysis with a summary of the current procedural posture of this case.  On May 4, 2007, Magistrate Judge Stinson approved a Joint Motion to Modify Amended Entry [Docket No. 104] that set forth a procedure reflecting the parties' agreement that they would file summary judgment motions in a two-step process: the Baker Defendants and Aetna would first file cross-motions for summary judgment as to their competing claims of ownership.  Then, once the Court resolved those motions, the claims and defenses related to the Stephenses would be addressed by additional summary judgment motions.

Contrary to this agreed-upon procedure, however, the Baker Defendants and Aetna both filed summary judgment motions against the Stephenses before the Court resolved their cross-motions for summary judgment against each other.  In their initial response to the Baker Defendants' summary judgment motion, the Stephenses did not specifically refer to the parties' prior agreement, but argued that, "the Bakers are prematurely attempting to gain an adjudication of the Stephens' [sic] right to the Cover on the merits and sidestepping their own obligations of proof."  Stephens Mem. at 6.  Rather than making a ruling on the substantive issues involved in the pending four summary judgment motions in its December 17, 2007, entry, the Court requested supplemental briefing to give all of the parties, including the Stephenses, an opportunity to fully develop their arguments, which all parties have now done, which brings us to the present point in the litigation.  Although the path of the litigation has deviated from the parameters agreed to

14

in the Joint Motion, we will address the summary judgment motions in the manner originally agreed upon by the parties.  Thus, we first address the Baker Defendants' and Aetna's competing claims of ownership.  Following resolution of their cross-motions for summary judgment, we assess the claims and defenses involving the Stephenses.

### A.    Baker/Aetna Cross Motions for Summary Judgment

#### 1.    <u>Baker v. Aetna</u>

Aetna contends that, in <u>Baker v. Aetna</u>, Judge Shields ruled that, as a result of the claim payment and the Sworn Statement in the Proof of Loss, Aetna acquired all right, title, and interest in the *entire* stolen philatelic collection (of which the Ice House Cover was a part), including all salvage rights.  As a result, Aetna claims, the doctrine of collateral estoppel, or issue preclusion, dictates that Judge Shields's legal determination regarding salvage rights may not be relitigated and that Aetna thus retains the salvage rights to the Ice House Cover.  <u>See</u> <u>Jones v. American Family Mut. Ins. Co.</u>, 489 N.E.2d 160, 165 (Ind. Ct. App. 1986) ("Issue preclusion . . . applies where the causes of action are not the same, but where some fact or question has been determined and adjudicated in the former suit, and the same fact or question is again put in issue in a subsequent suit between the same parties.") (internal quotation marks omitted).

Aetna further asserts that collateral estoppel does not, however, apply to Judge Shields's equitable determination awarding Mr. Baker possession of the then-recovered articles from the stolen collection because the equitable ruling applied only to the

15

recovered items Aetna had in its possession at that time, not to later-recovered pieces. Thus, Aetna contends that it is entitled to possession of the Ice House Cover because the equities in this case have shifted[9] following the approximately thirty years since Judge Shields handed down her ruling and as a result they now favor Aetna, rather than the Baker Defendants.

The Baker Defendants rejoin that the doctrine of collateral estoppel does not apply to Judge Shields's ruling regarding salvage rights because ownership of the Ice House Cover was not expressly adjudicated in Baker v. Aetna as it had not yet been recovered at the time the opinion was rendered.  According to the Baker Defendants, once Mr. Baker fully reimbursed Aetna, per Judge Shields's order, that payment satisfied and discharged Aetna's subrogated right, title and interest to all of the philatelic items, including the Ice House Cover.[10]  Alternatively, they argue that, if we determine that Judge Shields's holding regarding salvage rights should be given collateral estoppel effect, we must also abide by her equitable determination awarding the recovered philatelic items to Mr.

---

[9] Judge Shields's equitable award was premised upon two considerations: (1) the unique and irreplaceable nature of the philatelic articles to Mr. Baker; and (2) the substantial and unpredicted increase in value between the theft in 1967 and the recovery in 1976.  Joint Stip. Exh. 5 at 4.  Aetna contends that neither the Baker Estate nor Dorothy Baker, who did not share in Mr. Baker's philatelic pursuits, have any particular personal interest in the Ice House Cover beyond its monetary value.  Additionally, Aetna claims that, because the Ice House Cover has so significantly increased in value, if the Baker Defendants are awarded the stamp, they would reap a windfall at Aetna's expense.

[10] The Baker Defendants contend that no language contained in the insurance policy covering Mr. Baker's philatelic collection or in the Proof of Loss assigned any right, title, or interest to the stolen items to Aetna, it only gave Aetna subrogated rights.

Baker, particularly since, pursuant to that ruling, Mr. Baker already reimbursed Aetna for its total claim payment, plus interest.

Although both parties set forth issue preclusion arguments in their respective briefing on these cross-motions, we find a substantive determination regarding the collateral estoppel question unnecessary because our analysis proceeds along a different line of reasoning, as detailed below.  For purposes of our ruling on these cross-motions, we shall assume that Judge Shields's determination awarding Aetna salvage rights also applied to the then-unrecovered items, including the Ice House Cover.  However, for the following reasons, we ultimately conclude that, as between the Baker Defendants and Aetna, the Baker Defendants possess the ownership interest in and to the Ice House Cover.

It is clear, as Aetna argues, that at the time Judge Shields granted Mr. Baker equitable relief, she explicitly awarded him title only to the philatelic items in the collection that had been recovered at that time.  Although Mr. Baker was to recover from Aetna only *part* of his collection[11] (which excluded the most valuable piece, the Ice House Cover) in exchange for his payment to Aetna, the state court required him to repay the total amount, plus interest, that he had originally been paid by Aetna to cover the loss of the *complete* collection.  In other words, the amount that Mr. Baker was required to pay Aetna, pursuant to Judge Shields's ruling, did not reflect any deduction or calculation

---

[11] As previously noted, Mr. Baker received the majority of his collection; however, the Ice House Cover and one other philatelic item remained missing.

17

adjustment based upon the two items that were at that time still missing.

Thus, Aetna was made whole by Mr. Baker's $143,650.00 payment, and was returned to the position it had been in prior to insuring Mr. Baker, even though the complete collection was not then accounted for.  Although Judge Shields's equitable award did not explicitly take the unrecovered items into account, having required Mr. Baker to pay Aetna all that Aetna had ever paid him (including interest) to insure the entire collection, the principles of contract as well as equity support our conclusion that Aetna is not entitled to take ownership of that stamp or to receive additional reimbursement from Mr. Baker's estate to allow it to recover the Ice House Cover, which had been part of the original collection.  Consequently, as between the Baker Defendants and Aetna, we hold that the Baker Defendants have an ownership interest in the previously stolen Ice House Cover.


### 2.    The Receipt

Alternatively, Aetna contends that, regardless of our reading of Baker v. Aetna, Mr. Baker relinquished any and all remaining rights he might otherwise have possessed to the unrecovered philatelic items when, on December 20, 1977, following Judge Shields's ruling, he signed the settlement agreement with Aetna, entitled "Receipt," which provided that he: "acknowledges receipt of all such philatelic items [that Aetna had in its possession] and hereby releases Aetna Insurance Company . . . of any and every claim, demand, or right, of whatever kind or nature, on account of or in any way growing out of

18

Mr. Baker's loss on December 10, 1967, of a collection of philatelic items covered by

[the Aetna insurance policy]."  Joint Exh. 6, at 2.  Aetna claims that, under the plain terms

of this agreement, Mr. Baker conveyed to Aetna all claims and rights to the remaining,

not-yet-recovered philatelic items, including the Ice House Cover.

The Baker Defendants rejoin that, having just repaid Aetna the total amount that it

had paid to him pursuant to the original insurance claim payment, plus interest, pursuant

to Judge Shields's ruling, it makes no sense for Mr. Baker to be deemed to have given up

his rights to the remaining unrecovered portions of the collection, especially considering

that the then-missing Ice House Cover was the most valuable item in his collection.  The

Baker Defendants contend that, rather than conveying all future rights in the unrecovered

philatelic items to Aetna, the Receipt functioned solely as an acknowledgment that Mr.

Baker had paid Aetna the amount required by the state court and, in turn, had received all

of the philatelic items Aetna possessed at that time, thereby releasing Aetna from any

further liability stemming from the litigation before Judge Shields.

We regard the Baker Defendants' reading of the Receipt to be persuasive.  It is true

that, as Aetna contends, the last paragraph of the settlement agreement refers to the

December 10, 1967, loss of Mr. Baker's collection without qualification or distinction

between recovered and unrecovered items of the stolen collection.  However, that

paragraph cannot be read in isolation.  Instead, because contracts are to be construed

based on "an examination of all of [their] provisions, without giving special emphasis to

any word, phrase, or paragraph,"  Simon Property Group, L.P. v. Michigan Sporting

Goods Distributors, Inc., 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005) (citing Art Country

Squire, L.L.C. v. Inland Mortgage Corp., 745 N.E.2d 885, 889 (Ind. Ct. App. 2001)), we

shall read the Receipt as a whole in order to understand and interpret each of its parts in

proper context.

The first paragraph of the Receipt defines the context for the document as a whole,

providing that:

> [I]n consideration of the payment of the sum of One Hundred Forty Three
> Thousand Six Hundred Fifty Dollars ($143,650.00) by J. David Baker,
> Aetna Insurance Company has delivered to Mr. Baker *all philatelic items*
> (stamps, covers, and stampless covers) *in Aetna's custody or control which
> formed the basis of a certain lawsuit in the Hamilton Superior Court
> bearing Cause No. S76-082.*

Joint Exh. 6 at 2 (emphasis added).  The remainder of the Receipt following this opening

paragraph simply tracks the events that occurred as a result of Judge Shields's ruling in

Baker v. Aetna (i.e., both parties' acknowledgment that Mr. Baker paid Aetna the amount

required by the court and, in return, Aetna conveyed the philatelic items in its possession

to Mr. Baker).

Thus, the settlement agreement by its terms did not preserve any interest for Aetna

in the unrecovered stamps; it merely reflected the termination of the insured-insurer

relationship between Mr. Baker and Aetna with regard to the recovered stamps.  The

Receipt simply reflects the written acknowledgment by both parties that their respective

obligations to one another had been fulfilled, thereby signaling the termination of the

litigation before Judge Shields.  That agreement does not change our determination that as

between the Baker Defendants and Aetna, the Baker Defendants possess the ownership interest in and to the Ice House Cover.

For the foregoing reasons, we <u>GRANT</u> the Baker Defendants' Motion for Summary Judgment as against Aetna and <u>DENY</u> Aetna's Motion for Summary Judgment as against the Baker Defendants.[12]

### B.     The Baker Defendants' Motion for Summary Judgment Against the Stephenses

The Baker Defendants contend that they are entitled to summary judgment against the Stephenses because the Stephenses have no greater right or title to the Ice House Cover than the thief who initially stole it, which is to say, they have no rights.  The Baker Defendants further argue that, even if the Stephenses had a possessory interest in the Ice House Cover, they relinquished such right when they voluntarily abandoned the property by allowing the FBI to take possession of it.  Therefore, the Baker Defendants argue, the Stephenses have no standing to raise any claims or defenses related to the Ice House Cover, which, as everyone concedes, was originally stolen from Mr. Baker.

The Stephenses rejoin that, in light of the fact that they had possession of the Ice House Cover for an undetermined number of years, they acquired title to it against all others with the exception of the legal owner of the property.  They deny that they

---

[12] Because we have denied Aetna's Motion for Summary Judgment as against the Baker Defendants, we therefore also <u>DENY AS MOOT</u> Aetna's Motion for Summary Judgment against the Stephenses.

abandoned the Ice House Cover when they relinquished possession to the FBI and contend that they have at all times retained their possessory interest.  The Stephenses further argue that the Baker Defendants are barred from initiating a replevin action because: (1) the statute of limitations has run; and (2) the Baker Defendants abandoned their claim of entitlement to Ice House Cover by failing to consistently maintain efforts to locate and recover it during the thirty-year time period between 1977 and 2006, when it was eventually recovered.

### 1.      Possessory Interest

Initially, we address the Stephenses' contention that they have a claim to the Ice House Cover based on their continuous possession of it for an undetermined number of years.  Although possession of property creates a rebuttable presumption of ownership, possession is not tantamount to ownership.  Indiana Waste Systems of Indiana v. Indiana Dep't of State Revenue, 633 N.E.2d 359, 367 (Ind. Tax Ct. 1994).  Given that it is undisputed that the Ice House Cover was stolen from Mr. Baker in 1967, the well-settled principle of property law applies to the effect that a thief cannot acquire any title or right to property that he or she has stolen, and cannot transfer to another a better title than he or she has.  Guaranty Discount Corp. v. Bowers, 158 N.E. 231, 233 (Ind. Ct. App. 1927).

However, as the Stephenses argue, an exception to this rule applies if the property has been abandoned.  Once property is abandoned, the owner is divested of his ownership interest, barring him from any further claim to it, except that the former owner may again

appropriate it after it is abandoned, if it has not already been appropriated by someone else.  Long v. Drilling Mechanical Contractors, Inc., 705 N.E.2d 1022, 1025 (Ind. Ct. App. 1999) (quoting Schuler v. Langdon, 433 N.E.2d 841, 842 n.1 (Ind. Ct. App. 1982)).  Thus, if the Stephenses are able to demonstrate that the Ice House Cover was in fact abandoned by the Baker Defendants and that they (the Stephenses) acquired possession, or that the statute of limitations for an action in replevin has indeed run, they may be entitled to ownership of the Cover.

The Baker Defendants rejoin that, even if the Stephenses at one time had a possessory interest, they have no claim to the Ice House Cover because they lost any rights they may have had to it when they, themselves, abandoned the Cover by allowing the FBI to take possession of it.  In support of this contention, the Baker Defendants point to the fact that, on the property receipt that was given to the Stephenses after the FBI took possession of the Ice House Cover, the federal agent had checked the box entitled "received from," rather than the "seized" box.  See Exh. A.  The Stephenses rejoin that they only chose to turn the Ice House Cover over to the FBI because the situation had reached the point of being "like a stand-off" and they thought the Cover would be safer in the hands of the FBI than with the Chicago Police Department.  M. Stephens Dep. at 17; W. Stephens Dep. at 27-28.

In light of the circumstances facing the Stephenses at the time, we are unable to determine as a matter of fact whether they voluntarily relinquished title to as well as possession of the Ice House Cover when they gave it to the FBI.  Whether the Stephenses

23

abandoned their interest in the property when they relinquished possession of the Ice House Cover cannot be resolved on summary judgment.  Therefore, we proceed to address the Stephenses' defenses.

### 2.      Statute of Limitations

Initially, the Stephenses contend that the Baker Defendants are barred from bringing an action to recover possession of the Ice House Cover because the statute of limitations for doing so has long expired.  Both parties agree that, under Indiana law, the statute of limitations for a replevin action seeking recovery of the property is six years from the time the cause of action accrues.  Ind. Code § 34-11-2-7(3).  In Indiana, courts apply the "discovery rule" to toll the statute of limitations, so that the limitation period does not begin to run until "the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as the result of the tortious act of another."  Verdak v. Butler Univ., 856 N.E.2d 126, 133 (Ind. Ct. App. 2006) (quoting Wehling v. Citizens Nat'l Bank, 586 N.E.2d 840, 843 (Ind. 1992)).  In the context of stolen personal property, such as is the case here, the party claiming ownership "all the while . . . must exercise due diligence to investigate the theft and recover the works." Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc., 917 F.2d 278, 289 (7th Cir. 1994), reh'g den'd.

More specifically, in applying the discovery rule in a replevin action, the court must determine when the party claiming ownership knew or, in the exercise of ordinary

diligence, could have discovered that the individual possessing the item was claiming an ownership interest in the item.  Verdak, 856 N.E.2d at 133.  Additionally, "[i]n the context of a replevin action for particular, unique and concealed works of art, a plaintiff cannot be said to have 'discovered' his cause of action until he learns enough facts to form its basis, which must include the fact that the works are being held by another and who, or at least where, that 'other' is."  Autocephalous, 917 F.2d at 289 (citing O'Keeffe v. Snyder, 416 A.2d 862, 869-70 (N.J. 1980)).  The determination of what actions and efforts constitute reasonable diligence vary with the facts of each case.  Id.

The Stephenses contend that neither Mr. Baker, nor the Baker Defendants, maintained continuous efforts to locate and recover the Ice House Cover after the major part of the stolen stamp collection was recovered in the 1970s.  Additionally, the Stephenses contend that Mr. Baker ignored certain leads related to the stolen philatelic collection he received in the late 1960s, including declining to participate in an arrangement between an informant and the police in which Mr. Baker's collection could be recovered in exchange for $15,000.  Exh. A attached to Orbison Aff.  The Stephenses also point to the Baker Defendants' admissions that no efforts were made or resources expended in attempts to recover the Ice House Cover during the period between Mr. Baker's death in 1979 to January 4, 2006, when the Cover turned up.  Armstrong Admissions ¶¶ 5-7.  Thus, the Stephenses contend, a question of fact remains regarding whether the Baker Defendants exercised continuous due diligence in their attempts to locate the Ice House Cover, so to preclude summary judgment here.

25

The Baker Defendants rejoin that the Stephenses are unable to provide any examples of actions that could have been taken by Mr. Baker, Mrs. Baker, or Ms. Armstrong to locate the Ice House Cover prior to the time when it was recovered on January 4, 2006.  See M. Stephens Dep. at 15.  According to the Baker Defendants, it was reasonable for Mr. Baker to leave the investigation in the hands of the police department and the FBI, after he had reported the theft, especially since he periodically remained in contact with authorities in an effort to track their progress.  Additionally, the Baker Defendants have submitted numerous exhibits,[13] including various newspaper and journal articles recounting details of the theft of Mr. Baker's collection, to demonstrate the extensive efforts taken by Mr. Baker to recover the philatelic items and identify the perpetrator.  They point to the fact that the Ice House Cover was immediately recovered the very first time that it appeared in public after it was stolen (which was when the Stephenses brought it into the Stamp King) as further evidence that all the efforts that had been undertaken by Mr. Baker to publicize the theft and locate the Cover were successful.

In light of the Seventh Circuit's recognition that "the due diligence determination is . . . highly 'fact-sensitive and must be decided on a case-by-case basis,'" Autocephalous, 917 F.2d at 289 (internal citations omitted), we are unable to decide this issue without the benefit of a trial as the resolution of the due diligence question will turn

---

[13] The Stephenses' Motion to Strike [Docket No. 178] is directed at more than twenty of the Baker Defendants' supplemental exhibits and raises evidentiary issues that are more appropriately addressed in motions in limine.  Thus, we DENY the Stephenses' Motion to Strike and reserve these issues for pretrial resolution.

on the disentanglement of some confusing and murky fact issues as well as credibility

determinations, none of which can be decided at the summary judgment stage.  Thus, we

DENY the Baker Defendants' Motion for Summary Judgment as to the statute of

limitations issue.

### 3.    Abandonment

The Stephenses next argue that they are entitled to ownership of the Ice House

Cover because the Baker Defendants abandoned all rights they had in this philatelic

rarity.  Abandonment is "the relinquishment of property to which a person is entitled,

with no purpose of again claiming it, and without concern as to who may subsequently

take possession."  Right Reason Publications v. Silva, 691 N.E.2d 1347, 1351 (Ind. Ct.

App. 1998).  In Indiana, abandonment of property requires "a concurrence of the intention

to abandon and an actual relinquishment."  Long, 705 N.E.2d at 1025 (quoting Schaffner

v. Benson, 166 N.E. 881, 883 (Ind. Ct. App. 1929)).  An individual's intent to abandon

may be inferred from surrounding circumstances and can be demonstrated with acts or

conduct "clearly inconsistent with any intention to retain and continue the use or

ownership of the property."  Long, 705 N.E.2d at 1025 (internal citations omitted).

Generally, property is considered relinquished when the owner "voluntarily makes it

available for someone else's dispostion."  Id.

The Stephenses contend that questions of fact remain as to whether the Baker

Defendants intended to abandon their rights in the Ice House Cover, since neither Mr.

Baker, nor the Baker Defendants, in any way asserted an interest in the Ice House Cover following the recovery of the remainder of the collection and the settlement agreement reached between Mr. Baker and Aetna. The Stephenses rely heavily upon the fact that Mr. Baker signed, first, the Proof of Loss subrogating his right, title, and interest in the stolen collection to Aetna in exchange for a claim payment and, second, the Receipt after the settlement agreement. Additionally, the Stephenses contend that the Baker Defendants' behavior following Mr. Baker's death demonstrates that they abandoned any interest in the Ice House Cover, as there is no evidence that they made any effort to locate the Cover or even expressed any interest in its whereabouts thereafter.

The Baker Defendants respond that, after the bulk of the stamp collection was recovered, Mr. Baker and his attorney contacted the Illinois State's Attorney to inquire about the location of the Ice House Cover and any other information about it that might have been available. Beyond that inquiry, the Baker Defendants contend that there were no other leads for either Mr. Baker or themselves to investigate until the Cover was recovered in 2006. Additionally, Ms. Armstrong contends that the fact she has retained a significant number of documents pertaining to the Ice House Cover demonstrates that the Baker Defendants had no intention of abandoning the Cover.

For reasons similar to those explicated in Part II.B.2. *infra*, we find that there are too many questions remaining in the current factual record, particularly those regarding the Baker Defendants' intentions as to the Ice House Cover following Mr. Baker's death, as well as credibility issues that cannot be decided at the summary judgment stage. We

28

note as well the factual controversies surrounding the Stephenses' acquisition of the Ice House Cover which also bear on the legal issues explicated above.  Thus, we <u>DENY</u> the Baker Defendants' Motion for Summary Judgment as to the issue of abandonment.

### C.      Stephenses' Motion for Jury Trial

This matter is currently set for a bench trial.  In fact, it was so docketed on two separate occasions.  In our entry issued on July 17, 2007 [Docket No. 120], we set this case for a bench trial set to begin on January 7, 2008.  That trial date was later vacated in our entry issued on October 15, 2007 [Docket No. 151], and was reset, again, for a bench trial, to begin on July 14, 2008.  The Stephenses filed no objection to the first entry setting the matter for a bench trial and then waited nearly seven months after the Court had issued its second bench trial scheduling entry before filing their Motion for Jury Trial on May 7, 2008 [Docket No. 188].

Pursuant to Federal Rule of Civil Procedure 38, a demand for jury trial may be made by serving the other parties with a written demand no later than ten days after the last responsive pleading and filing that demand in accordance with Rule 5(d).  Fed. R. Civ. Pro. 38(b).  The failure to serve and file such a demand constitutes a waiver by the party of trial by jury.  Fed. Rule Civ. Pro. 38(d).  In this case, the Answer filed by the Baker Defendants on November 16, 2006, was the last pleading responsive to the Complaint.  Accordingly, pursuant to Rule 38(b), in order to be timely, a demand for jury trial was required to be served and filed on or before November 29, 2006.  However, the

Stephenses did not file their Motion for Jury Trial until nearly a year and a half after this deadline, indeed, a matter of only a few weeks before trial.

The Stephenses attempt to justify this delay by explaining that each of their jointly filed Case Management Plans,[14] the latest of which was submitted on April 22, 2008, as approved by Magistrate Judge Stinston on May 1, 2008, explicitly referenced a trial by jury. While the Stephenses concede that making a demand for a jury in the case management plan is "not a preferred practice," they maintain that such a demand fulfills the filing and notice requirements provided for in Rule 38. In support of their motion, the Stephenses rely heavily upon the Northern District of New York's decision in Palmer v. Angelica Healthcare Services Group, Inc., 170 F.R.D. 88 (N.D.N.Y. 1997), in which the court held that timely service on an opposing party of a proposed case management plan met the jury demand requirements.

Even if the holding in Palmer were controlling here, and it is not, the facts here are easily distinguishable. In Palmer, the party requesting a jury trial actually served a proposed case management plan on the other parties, which expressly indicated that a jury was being demanded. Id. at 89. Conversely, in the case at bar, the Stephenses did not serve their proposed case management plan on the other parties, nor did the case management plan specify that the Stephenses were actually demanding a jury trial. Thus,

_____

[14] According to the Stephenses, these include: Proposed Case Management Plan [Docket No. 56], Magistrate Judge's Summary of CMP [Docket No. 56-2], Approved CMP [Docket No. 59], and Revised CMP [Docket No. 186].

the provision in the case management plan referring to a trial by jury did not suffice as a substitute for the notice and other time requirements provided for by Rule 38.  To hold otherwise under these circumstances would deprive Rule 38 of its central meaning and significance.

Therefore, for the reasons detailed above, we <u>DENY</u> the Stephenses' Motion for a Jury Trial.  This matter remains set for a bench trial, as scheduled, to begin on July 14, 2008.

## III.    Conclusion

For the reasons detailed above, we <u>GRANT</u> the Baker Defendants' Motion for Summary Judgment against Aetna and <u>DENY</u> Aetna's Motion for Summary Judgment against the Baker Defendants.  We also <u>DENY AS MOOT</u> Aetna's Motion for Summary Judgment against the Stephenses.  Additionally, we <u>DENY</u> the Baker Defendants' Motion for Summary Judgment against the Stephenses.  Finally, we <u>DENY</u> the Stephenses' Motion to Strike and <u>DENY</u> their Motion for Jury Trial.

IT IS SO ORDERED.

Date:  _____06/11/2008_____

Copies to:
Dean R. Brackenridge
LOCKE REYNOLDS LLP
dbrackenridge@locke.com

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

31

David W. Craig
CRAIG KELLEY & FAULTLESS
dcraig@ckflaw.com

Kerri Elizabeth Farmer
CRAIG KELLEY & FAULTLESS
kfarmer@ckflaw.com

Scott Anthony Faultless
CRAIG KELLEY & FAULTLESS
sfaultless@ckflaw.com

Jamie Ranah Kendall
PRICE WAICUKAUSKI & RILEY
jkendall@price-law.com

Erin Reilly Lewis
UNITED STATES ATTORNEY'S OFFICE
shaq.shockley@usdoj.gov

Carol A. Nemeth
PRICE WAICUKAUSKI & RILEY
cnemeth@price-law.com

Henry J. Price
PRICE WAICUKAUSKI & RILEY
hprice@price-law.com

William N. Riley
PRICE WAICUKAUSKI & RILEY
wriley@price-law.com

Steven J. Strawbridge
LOCKE REYNOLDS LLP
sstrawbridge@locke.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov